

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-14-00261-CV

IN THE INTEREST OF G.H., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-98128J-13

----------

## MEMORANDUM OPINION ON GUARDIAN/ATTORNEY AD LITEM'S AND INTERVENORS' MOTIONS FOR EN BANC RECONSIDERATION[1]
----------

Intervenors K.C. and S.C. and the guardian/attorney ad litem for G.H. filed motions for en banc reconsideration of our February 12, 2015 opinion. We grant the motions, withdraw our opinion and judgment of February 12, 2015, and substitute the following.

---

[1]See Tex. R. App. P. 49.7.

This is an ultra-accelerated appeal[2] from an order terminating the parental rights of Appellant H.H. (Father) and Appellant L.S. (Mother) to their daughter G.H. In one issue, Father argues that the evidence is legally and factually insufficient to support the trial court's best-interest finding under Texas Family Code section 161.001(2). *See* Tex. Fam. Code Ann. § 161.001(2) (West 2014). In four issues, Mother argues that the trial court improperly denied her motion to strike the Intervenors' petition in intervention; that the evidence is legally and factually insufficient to support the trial court's findings under Texas Family Code sections 161.001(1)(D), (E), (F), and (M) and 161.001(2); and that her trial counsel provided ineffective assistance of counsel. *See id.* § 161.001(1)(D)–(F), (M), (2). We affirm the trial court's judgment.

## Background

The record reveals that the Department of Family and Protective Services (the Department) initiated the underlying suit due to Father's and Mother's methamphetamines use. Mother, Father, and Mother's son Trey[3] were arrested

---

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[3]Mother has six children: Justin, twenty-five years old at the time of trial; Dustin, age twenty-three; Trey, age nineteen; J.S., age nine; C.C., age five (although Mother believed he was seven); and G.H., who was a little over a year old. At the time of trial, Justin lived with Mother's sister, Aunt Rhonda. Aunt Rhonda had adopted C.C. after Mother's rights to him were terminated. Dustin was incarcerated. Trey lived with his maternal grandparents. J.S. lived with the Intervenors.

in January 2013 for possession of methamphetamines. Mother entered a plea arrangement in which she received five years' probation in exchange for testifying against Father and Trey.

Throughout the pendency of the case, Father was incarcerated or was undergoing inpatient drug rehabilitation and had little contact with G.H. Mother, on the other hand, utilized the services provided by the Department and appeared to have turned her life around, and the trial court granted the Department's motion for a monitored return of G.H. to Mother.

Following the trial court's return of G.H. to Mother, the former temporary possessory conservators—Mother's sister, K.C., and her husband, S.C. (the Intervenors), who had cared for G.H. while Mother utilized her Department-provided services—filed a petition in intervention, seeking to terminate Mother's and Father's parental rights to G.H. Mother responded by filing a motion to strike the Intervenors' plea in intervention, which the trial court denied.

Believing that Mother was doing well with the monitored return of G.H., the Department waived its termination grounds as to both Mother and Father, deciding instead to proceed only on its motion to modify conservatorship. At the conclusion of the trial, the Department asked the jury not to terminate Mother's parental rights, to appoint the Department as permanent managing conservator of G.H., and to appoint Mother as possessory conservator of G.H.[4] The

---

[4]Although the Department supported Mother at trial and requested that she be named G.H.'s possessory conservator, on appeal, the Department has filed

3

Department made no recommendation as to terminating Father's parental rights. The Intervenors and G.H.'s guardian ad litem both asked for termination.

A jury found by clear and convincing evidence that Father and Mother had each committed at least one act under section 161.001(1) and that termination of the parent-child relationship between Father and G.H. and between Mother and G.H. was in G.H.'s best interest. Based on the statutory grounds found by the jury, the trial court ordered the parent-child relationship terminated between Father and G.H. and between Mother and G.H.

## Discussion

### I. Motion to strike petition in intervention

In her first issue, Mother argues that the trial court abused its discretion by improperly denying her motion to strike the Intervenors' petition in intervention. Mother contends that the Intervenors' pleadings were legally and factually insufficient to meet the minimum statutory requirements showing that appointment of Mother as sole managing conservator would significantly impair G.H.'s physical health or emotional development.

---

briefs supporting the trial court's judgment terminating Mother's and Father's parental rights to G.H. Mother has filed a "Motion To Strike State's Response Brief," and the Department has filed a response. We decline to strike the Department's brief and overrule the "Motion To Strike State's Response Brief." G.H.'s guardian ad litem stated in a letter to this court that he agrees with and supports the brief filed by the Department.

## A. Standard of review and general law on standing

The standard for determining whether the trial court improperly denied a motion to strike intervention is abuse of discretion. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990); *In re N.L.G.*, 238 S.W.3d 828, 829 (Tex. App.—Fort Worth 2007, no pet.). Generally, an intervenor must have standing to maintain an original suit in order to intervene. *Spurck v. Tex. Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 217 (Tex. App.—Austin 2013, no pet.).

An analysis of whether a party has standing begins with the plaintiff's live pleadings. *See Jasek v. Tex. Dep't of Family & Protective Servs.*, 348 S.W.3d 523, 527 (Tex. App.—Austin 2011, no pet.). The plaintiff has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). We must also consider evidence the parties presented below that is relevant to the jurisdictional issues, *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000), including any evidence that a party has presented to negate the existence of facts alleged in the plaintiff's pleading. *See Miranda*, 133 S.W.3d at 227. If the facts relevant to jurisdiction are undisputed, the jurisdictional determination is a matter of law. *See id.* at 228.

When standing has been conferred by statute, the statute itself serves as the proper framework for a standing analysis. *See Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984). The party seeking relief must allege and establish

5

standing within the parameters of the language used in the statute. *In re H.G.*, 267 S.W.3d 120, 124 (Tex. App.—San Antonio 2008, no pet.).

## B. Law governing standing in suits affecting the parent-child relationship (SAPCRs)

A party's standing to file an original SAPCR is governed by sections 102.003 and 102.004(a) of the family code. *See* Tex. Fam. Code Ann. § 102.003 (West 2014) (providing general standing to file original suit), § 102.004(a) (West 2014) (providing additional standing for grandparent or close relative to file original suit for managing conservatorship).

Under section 102.003, entitled "General Standing to File Suit," an original suit may be filed at any time by "a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition." *Id.* § 102.003(a)(9). An individual claiming standing under this statute need only file her petition and allege facts that meet the statutory requirement. *See id.*; *Miranda*, 133 S.W.3d at 226. In such a case, pleading a proper basis for standing is sufficient to show standing, unless a party challenges standing and submits evidence showing the non-existence of a fact necessary for standing. *See Miranda*, 133 S.W.3d at 227. In that event, the petitioner must submit evidence raising a fact issue on the challenged elements to avoid a dismissal for lack of standing. *See id.* at 227–28.

6

### C. Analysis

Here, the record demonstrates that the Intervenors' live pleading at the time of the hearing on Mother's motion to strike the plea in intervention was the Intervenors' first amended petition in intervention, which pleaded that they had standing to intervene under sections 102.003(a)(9) and 102.004(b).[5] Specifically, the Intervenors alleged that they had actual care, control, and possession of the child for well over six months ending not more than ninety days preceding the filing of the intervention. The Intervenors' first amended petition in intervention thus alleged facts sufficient to affirmatively demonstrate that they had standing to intervene in the SAPCR filed by the Department. *See Jasek*, 348 S.W.3d at 531; *Jackson v. Wright*, No. 03-10-00391-CV, 2011 WL 3890403, at *3 (Tex. App.—Austin Aug. 31, 2011, no pet.) (mem. op.). It was then incumbent on Mother to contest the Intervenors' intervention, which she did by filing a motion to strike.

Mother's motion, however, did not challenge any of the Intervenors' factual allegations regarding standing under section 102.003(a)(9). Instead, Mother concedes that "[u]nder the broad guidelines of 102.003, the Intervenors would have had automatic standing." And our review of the record supports the

---

[5]Section 102.004(b) of the family code provides a "relaxed standing rule" by which parties who would not have standing to file an original suit for managing conservatorship may nonetheless intervene in an ongoing suit if they are deemed by the court to have had substantial past contact with the child and show satisfactory proof to the trial court that appointment of a parent as sole managing conservator would significantly impair the child's physical health or emotional development. *See* Tex. Fam. Code Ann. § 102.004(b); *Spurck*, 396 S.W.3d at 217.

Intervenors' factual allegations: the trial court appointed the Intervenors as temporary possessory conservators of G.H. "with care, custody, and control of [G.H.]," as well as the right to have physical possession of G.H., on April 30, 2013; the trial court removed the Intervenors as temporary possessory conservators of G.H. on February 18, 2014—reflecting that they had physical possession of G.H. for more than six months; and the Intervenors filed their petition in intervention on March 4, 2014, which was not more than ninety days after they lost actual care, control, and possession of G.H. The Intervenors thus established their right to intervene as a matter of law.[6] *See Jasek*, 348 S.W.3d at 537 (holding that couple, with whom the Department had placed children after removing them from biological parents, demonstrated standing under section 102.003(a)(9) to intervene in SAPCR initially filed by the Department); *Jackson*, 2011 WL 3890403, at *3 (holding that paternal step-grandmother established standing as a matter of law under section 102.003(a)(9) to intervene in SAPCR); *Smith v. Hawkins*, No. 01-09-00060-CV, 2010 WL 3718546, at *4 (Tex. App.— Houston [1st Dist.] Sept. 23, 2010, pet. denied) (mem. op.) (holding that aunt

---

[6]To the extent that Mother argues that the Intervenors were required— because they had also pleaded standing under section 102.004(b)—to show satisfactory proof to the court that there is a significant risk of impairment to the child and to obtain leave to intervene, Mother has not cited any case law, nor have we found any, demonstrating why the Intervenors would be required to meet both a general standing requirement and a more specific standing requirement like that found in section 102.004(b). *Compare* Tex. Fam. Code Ann. § 102.003(a), *with id.* § 102.004(b). Nor does section 102.004(b) contain mandatory language requiring the Intervenors to meet more than one standing requirement. *See id.* § 102.004(b).

8

established standing under section 102.003(a)(9) to intervene in SAPCR). We therefore hold that the trial court did not abuse its discretion by denying Mother's motion to strike the Intervenors' petition in intervention. *See Smith*, 2010 WL 3718546, at \*2, \*4 (holding that trial court did not abuse its discretion by denying father's motion to dismiss aunt's intervention). We overrule Mother's first issue.

## II. Grounds for termination

In Mother's second issue, she argues that the evidence supporting the jury's findings on the statutory grounds for termination was legally and factually insufficient. The jury found that Mother had knowingly placed or had knowingly allowed G.H. to remain in conditions and surroundings that endangered G.H.'s physical or emotional well-being; had engaged in conduct or had knowingly placed G.H. with persons who had engaged in conduct that endangered G.H.'s physical or emotional well-being; had had her parent-child relationship terminated with respect to another child based on a finding that her conduct was in violation of section 161.001(1)(D) or (E) of the family code; or had failed to support G.H. in accordance with her ability during a period of one year ending within six months of the date of the filing of the petition. *See* Tex. Fam. Code Ann. § 161.001(1)(D)–(F), (M).

### A. Standard of review

In this termination case, the Intervenors seek not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's

right to inherit. *See id.* § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, because the Intervenors seek to sever permanently the relationship between a parent and a child, they must first observe fundamentally fair procedures. *See In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a) (West 2014); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's

actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

### 1. Legal sufficiency

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

11

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573. If we determine that no reasonable factfinder could form a firm belief or conviction that the termination of the parent-child relationship would be in the best interest of the child, then the evidence is legally insufficient, and we must generally render judgment for the parents. *J.F.C.*, 96 S.W.3d at 266; *see* Tex. R. App. P. 43.3.

### 2. Factual sufficiency

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated provision (D), (E), (F), or (M) of section 161.001(1) and that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. §§ 161.001(1)(D)–(F), (M), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so

12

significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### B. Analysis

The Department argues that Mother did not preserve her legal sufficiency challenges. There are four ways to preserve a challenge to the legal sufficiency of evidence: (1) a motion for instructed verdict; (2) an objection to the submission of a jury question; (3) a motion for judgment notwithstanding the verdict; or (4) a motion for new trial. *Cecil v. Smith*, 804 S.W.2d 509, 510–511 (Tex. 1991). Mother filed a motion for new trial, but she only challenged the factual sufficiency of the evidence. Because Mother did not raise her legal sufficiency challenge in the trial court, she has not preserved that complaint. *In re J.M.S.*, 43 S.W.3d 60, 62 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (holding that parents waived legal sufficiency challenge when they failed to preserve it by any of the four ways described above); *see also In re T.S.*, No. 14-01-00352-CV, 2002 WL 480371, at *4 (Tex. App.—Houston [14th Dist.] Mar. 28, 2002, no pet.) (not designated for publication) ("[A] motion for new trial fails to preserve a sufficiency argument for review if the argument urged on appeal was not raised in the motion or otherwise during trial.").

In her brief on appeal, Mother acknowledges that the Department submitted into evidence a certified copy of the order of termination of Mother's parental rights to her child, C.C. The order shows that Mother's parental rights to

13

C.C. were terminated on (D) and (E) grounds. Mother did not object to the admission of the termination order. The evidence is therefore factually sufficient to support termination on the ground that her parental rights had been terminated with respect to another child based on a finding that her conduct violated subsection (D) or (E).[7] *See* Tex. Fam. Code Ann. § 161.001(1)(M); *In re J.M.M.*, 80 S.W.3d 232, 243 (Tex. App.—Fort Worth 2002, pet. denied), *disapproved of on other grounds*, *J.F.C.*, 96 S.W.3d at 267 & n.39. Because, along with a best interest finding, a finding of only one ground alleged under section 161.001(1) of the family code is necessary to support a judgment of termination, we need not address the remainder of Mother's second issue. *See* Tex. R. App. P. 47.1; *see also In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.). We overrule Mother's second issue.

## III. Best interest

In his sole issue, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of Father's parental rights to G.H. is in her best interest. In her third issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that

---

[7]Mother also argues that the jury charge improperly comingled the four grounds for termination in one multifarious question. Mother did not object to the charge to the trial court, and has thus waived this issue. *See In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) (stating that complaints of error in broad-form submission must be preserved by objection at trial).

14

termination of Mother's parental rights to G.H. is in her best interest. We note however that Mother has failed to preserve her legal sufficiency complaint, as discussed above.[8]

### A. Presumption and the statutory and *Holley* factors

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

---

[8]The Department also argues that Father did not preserve his legal and factual sufficiency complaints. However, Father timely filed a motion for new trial, challenging both the legal and factual sufficiency of the evidence to support the termination of his parental rights.

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

16

Other, nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a

17

finding. *Id.* That is, "[a] lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

### B. The evidence

#### 1. The child's age, needs, vulnerabilities, and desires

G.H. was approximately fifteen months old at the time of the termination trial, and thus her desires were not known. *See Holley*, 544 S.W.2d at 371–72. G.H. was born prematurely and was in intensive care at the hospital. *See* Tex. Fam. Code Ann. § 263.307(b)(1), (3). Mother testified that she was clean for about six months of her pregnancy with G.H. and that she stopped using drugs when she found out she was pregnant. Mother's son, Dustin, stated that Mother was visibly pregnant when he witnessed her using methamphetamines. After G.H. was born, Mother and Father relapsed while G.H. was in the hospital. *See id.* § 263.307(b)(4).

There was no evidence that G.H. was bonded to Father. Denise Hamilton, a conservatorship worker testified that Mother and G.H. were bonded. Hamilton testified that Mother understands G.H.'s needs and capabilities. *See id.* § 263.307(b)(12)(F). She said, "when [G.H.] wants something, you know, she does the hand gestures or—you know, or she looks a certain way or she cries, and [Mother] kind of knows exactly what she wants by the way she, you know, moves or cries." Mother testified that she believes she can meet G.H.'s emotional and physical needs now and in the future because she has "worked

18

hard to get to where [she is], to change [her] life and to change [her] ways and change who [she is]." *See Holley*, 544 S.W.2d at 371–72.

### 2. The frequency and nature of out-of-home placements

G.H. was removed from Mother and Father's care about a month after she was born. *See* Tex. Fam. Code Ann. § 263.307(b)(2). She remained in the Department's care for a month and was then placed with the Intervenors in April 2013. In February 2014, the trial court granted a monitored return to Mother. Tabitha Githengu, a case aide at Salvation Army, testified that G.H. was not fearful of Mother. *See id.* § 263.307(b)(5).

### 3. Psychiatric, psychological, or developmental evaluations

Mother testified that she had previously been diagnosed with depression. *See id.* § 263.307(b)(6). She was prescribed medication, but she "took [her]self off that medicine" because "[t]hat stuff makes you crazy." She was required to have a mental health evaluation as part of her probation, but she had not yet been at the time of trial.

Father testified that he had been diagnosed with depression in 2000. He had been prescribed medications in the past, but had not gone back for doctor appointments when he was incarcerated.

### 4. Abusive or assaultive conduct

Mother acknowledged that her three oldest children had been exposed to family or domestic violence. *See id.* § 263.307(b)(7). She testified that when she was with the father of her oldest two children, he used to beat her. She testified

19

that with the father of her third child, the children were exposed to "[f]ighting, drinking, me being put in the hospital." She denied being a perpetrator of domestic violence, but said, "after a while, you learn to fight back." She said that the father of her fourth child was "very emotionally abusive." She also acknowledged that she and Father "have had some violent altercations."

Mother said that she would do everything that she possibly could to protect G.H. from emotional and physical danger. *See id.* § 263.307(b)(12)(E). Mother's son Justin testified that Mother has "a temper." He said, "I mean, it kind of runs in our family. I mean, once you get mad, it's—you don't even think no more. You just kind of blackout and stuff happens." He said he was concerned that Mother would "be a slight abusive" to G.H. He explained:

> A. I mean, because—I mean, babies, they scream, they cry when they don't want—you know, when they ain't got what they want, and she's probably going to yell, holler.
>
> Q. When you say "yell"—
>
> A. She don't have the patience for that kind of stuff.

Mother testified that she was convicted of injury to a child for biting Justin when he was thirteen years old. She explained,

> I wanted him to go with me. He didn't want to go with me. Me and my parents and the family, everybody was in a uproar. He ended up holding me down, and when he held me down, I lost everything. I didn't even know what happened to him. I didn't know what I did to him because of his dad used to beat me all the time and hold me down. And I can't tell you that I even remember what happened after that.

Mother's son, Trey, testified that when he was three to five years old,

20

[S]he beat me with hangers, she beat me with a telephone. I would try to get up because it was midday and I wanted to go do something or I wanted to go around the house while she'd be doing something and she'd beat me and make me stay in the bed and would not let me get out.

Mother's other son, Dustin, testified that he witnessed Mother being hit in the face by her ex-boyfriend Rowdy while she was pregnant with G.H. He saw Rowdy beat Mother three or four times.

Mother said,

[N]ow I'm a different person, and I don't have all that anger and all that ugliness built up inside me, and I've went through parenting classes, parenting skills, and I've learned how to, you know, maybe just take a breather and walk away for a minute and then come back and handle the situation.

### 5. Substance abuse

Father admitted that he had been incarcerated for a good portion of the year before trial for possession of methamphetamines. He believed he had been addicted to methamphetamines for about twenty-five years. At the time of trial, Father had been clean for ninety days.

Mother calculated that she had only used methamphetamines for seven or eight years. However, she testified that she began using methamphetamines sixteen or seventeen years ago. *See id.* § 263.307(b)(8). She stated that she did not do drugs during the years that she was incarcerated. She testified that she was incarcerated from 2001 to 2003, and when she was released from prison in 2003, she "stayed clean for a little while, . . . but it didn't last." Mother testified that she was incarcerated again in 2007. When she was released in

21

2009, she stayed off drugs "for about a year," but that she relapsed because she did not have her family's approval. Mother testified she did not believe that the saying "once an addict, always an addict" was true.

Mother's sister, Aunt Rhonda, adopted Mother's son, C.C. Aunt Rhonda testified that C.C. is considered a special needs child because of his exposure to methamphetamines in utero. She said, "He takes daily medication. He has some behavior issues. He's extremely hyperactive. He does not sleep at night. He has horrible, vivid dreams that he screams out in his sleep." C.C. also had physical therapy because "[h]e couldn't pick up small things. He couldn't climb things. He couldn't crawl for a while. He didn't walk until after the age he should have been walking. He couldn't talk."

Three of Mother's children testified that she had offered them drugs. Mother admitted to using drugs with her two oldest children. *See id.* § 263.307(b)(12)(C). She explained, "It's not something I'm proud of, but I thought it was a way of protecting them in our addiction." She also testified that she had bought alcohol for her children when they were minors.

Justin testified that Mother introduced him to methamphetamines when he was about eighteen years old. He said Mother never talked to him about not doing drugs. He used drugs with Mother almost every day until he went to prison when he was twenty-one. Justin was incarcerated for possession of a prohibited firearm under eighteen inches, burglary of a building, and theft charges, which he testified were related to his methamphetamines use.

22

Dustin testified that Mother gave him methamphetamines when he was sixteen years old. He said,

> There was some cars out in our backyard and my grandma was going to get cited the next day if we didn't get the cars out of there. And I was—it was late at night, so I was starting to go to sleep. And she told me to do this and it will wake you up so that your grandma don't get ticketed and we get these cars out of here.

Dustin testified that he used drugs with Mother a couple of times a week. Dustin was arrested with Mother and Father for possession of methamphetamines and was incarcerated at the time of trial. Dustin ex-girlfriend, Sara, testified that she was sixteen years old when Mother introduced her to methamphetamines.

Mother's third son, Trey, also testified that Mother had offered him drugs and that she was a bad influence on him. He said, "She's offered me meth, but then she's also offered me weed and other pills and all kinds of other stuff." Trey testified that in the year prior to trial, Mother had offered him drugs and gave him a bottle of liquor for his birthday. He said, "[I]t had a couple of sips taken out of it. She told me she tried it and that she didn't like it, so that was my birthday present." Trey also testified that he had gone out to eat with Mother and G.H. after G.H. had been returned to Mother's care and that Mother had wanted to have margaritas with him.

### 6. Completing services and cooperating with the Department

At the time of trial, Father had not completed any of the tasks on his service plan. Mother testified that she completed all the services on her service

23

plan. *See id.* § 263.307(b)(10). Mother completed a ninety-day inpatient rehab program. When she was released, she moved into the Salvation Army.

Mother's case aide at Salvation Army testified that Mother has made positive changes in her life, is very cooperative, and follows the rules. She believed that Mother understands G.H.'s needs and capabilities. She said, "[Mother] meets all [G.H.'s] physical needs, everything the child needs from a mother, and I believe she—she has changed, and she deserves a second chance." The case manager at Salvation Army also testified that Mother was meeting her goals and "doing everything she's supposed to do." Hamilton testified that Mother has been "very compliant" and has made positive changes.

Mother's current probation officer testified that Mother owed $1,744 in court costs and fines and $645 in lab fees but that she has been making payments. The officer said that Mother was in compliance with her probation conditions. The officer also testified that abstaining from alcohol was a condition of her probation. Mother's previous probation officer also testified that Mother had done well on probation.

Mother testified that she attends Narcotics Anonymous (NA) meetings twice a week. She no longer has a sponsor through NA, but she said that her mentor from church, Lori Hale, serves as a sponsor for her. Mother testified that she goes to church every Sunday and that people at her church "have taught [her] how to be a responsible woman." She was taking a course through the church about the roles of parents in a family.

24

Mother's substance abuse therapy counselor testified that Mother had been making changes in her lifestyle and was completing the work she needed to do to meet her probation conditions. She said,

> [Mother] was able to look at what she had done and see how—how the substance has played a part within what she had done to the people in her life, the people surrounding her, to her family, her children. And she was able to work on changing that within her life again—look at, you know, how it affected them and to change what she needed to so it didn't happen again.

The counselor also testified that if Mother had been consuming alcohol in the past three months, she would be concerned. Mother's previous substance abuse counselor also testified that it would be a problem if Mother were drinking alcohol. She explained, "I know her conditions of probation state that she's not allowed to drink. And I think sometimes, depending on a specific person, a drink could lower your inhibitions and all of a sudden you are on to different things, like drugs."

Mother testified that she has held a full-time job for four months at the time of trial. Before that, she worked at the Dollar Tree for five months. She had never held a job before that.

### 7. Willingness and ability to effect positive changes

At the time of trial, Father was in the process of completing drug rehabilitation and then planned to participate in a year-long aftercare program. When asked why he was in the program, he answered, "Because I chose to. Tired of—I seen big improvement in [Mother] because she's come a long way,

25

and I realized how—you know, what I needed to do, and I still need it and I'm going to still need it. I'm ready to make a change." Father acknowledged that he had a "fairly lengthy" criminal history including burglary, theft, and fraud convictions.

Mother testified that she has visited friends with whom she used to use drugs. *See id.* § 263.307(b)(11). Mother described one woman, Edie Ricketts, as a maternal figure. Mother testified that she took G.H. to Ricketts's house. She stated that she only saw Ricketts once after the death of a mutual friend and once when Ricketts gave her a ride to jail to see Sara, the mother of Mother's two grandchildren. Hale, Mother's church mentor, testified that Mother had seen Ricketts twice after two different friends had died.

Sara testified that she had driven Mother and G.H. twice to Ricketts's house. Sara said, "We just took the baby over there to see Edie. . . . Edie was mad that she [hadn't] seen the baby since she got her back." Mother called Ricketts on the way to the house and told Ricketts "to put the dope up before we got there." Sara testified that she had taken Mother to one funeral before G.H. had been returned to Mother's care. Sara also said that Mother and Ricketts had come to visit her in jail.

Mother's son, Trey, testified, "I've seen [Mother] and her friend Edie, which whenever she got out of prison, she promised that she would not go around her because that's where her addiction started and she still goes around her, and she still goes around her today." Trey said that Ricketts used to sell

26

methamphetamines. About a year prior to trial, Mother had taken him to Ricketts's to get methamphetamines to trade for a haircut.

Sara testified that since the time that Mother completed the rehab program, she has taken weekend trips to see her ex-boyfriend Rowdy. Sara testified that she had previously used drugs with Mother and Rowdy, and Dustin testified that Rowdy had been abusive to Mother in the past. Sara said that since G.H. had been returned to Mother's care, Mother had maintained phone contact with Rowdy.

Mother testified that she had a friend on Facebook named Joe Crisp with whom she had taken G.H. to the races and then to eat at Razoo's restaurant. Sara testified that two months prior to trial, Mother sent her a picture of a mixed drink from Razoo's and told Sara that she was "eating and having a drink with some guy and the baby." Sara also said that Mother said Crisp used methamphetamines and that she had spent the weekend with Crisp and G.H. Sara testified that Mother said "that's all he would talk about whenever she was there staying the weekend with him."

Mother testified that she later "found out what kind of person he was" and that she no longer talks to him. But she also said she "still say[s] things to him on Facebook." Sara testified that Mother stopped talking to Crisp for "a couple of weeks," but "she started talking to him again because she wanted him to buy her a car." When asked if she had been drinking while on probation, Mother invoked her Fifth Amendment right against self-incrimination.

27

Hamilton testified that she would be concerned if Mother were spending time with friends with whom she used to use drugs. Hamilton also said she would be concerned if Mother refused to testify regarding whether she had consumed alcohol in the three months before trial. Terica Brager, Hamilton's supervisor, testified that having heard testimony that Mother "may have consumed alcohol, that she may have been with people that she used to use drugs with, that she may have left the county with [G.H.] without [the Department's] knowledge," she changed her recommendation that Mother be made G.H.'s permanent managing conservator. She said,

> I would recommend that the Department be made PMC, permanent managing conservator, and I would still be willing to allow [Mother] to have possession while we put all those other things in place, continue the support. There was a lot of testimony about the amount of time that she's been sober, and I can't say that we can work the case for five years, but, hopefully, my—our job is intervention, and that's what we try to do. We work to break these cycles.
>
> She's done more than some clients that—of mine that have only used maybe five years. It's about where she is right now, and as much as we can offer the opportunity in a safe manner, you know, for her to stay clean with [G.H.] in her possession, then we can do that.

Hale testified that she has watched Mother transform herself over the last year. She said, "I have seen a distinct change from the first day I met her." Hale believes that Mother takes good care of G.H. and can meet G.H.'s needs now and in the future. Hale said that it would not be in Mother's best interest if she

28

were drinking alcohol because "[i]t's against her probation and it's against her succeeding."

Intervenor S.C. testified that Mother sent him and K.C. harassing phone calls and text messages. K.C. also testified that phone or text message conversations with Mother "usually . . . end[] up in some kind of altercation." When asked about Mother's progress in treatment, S.C. said, "[I]t just doesn't sound like it's working. I mean, if you're still hanging around the same people and everything. I mean, that's not the way it works. . . . And that's not what the baby needs to be around."

K.C. testified,

I think the work that she has done is wonderful. I think if she is completely and totally serious, that is a great thing. But I don't believe after her history that one year is enough. I don't believe that. I also believe that she will continue to be angry. You know, you can take the drugs out of her life, but how about the anger? How about, you know, the way she has raised her other children? How is she going to maintain? How is she going to get by all of those things?

K.C. said she was concerned that Mother "will continue to hang out with the same people, that she will continue to take this child into places and situations that she should not be in." K.C. admitted that she did not have any proof that Mother was an immediate danger to G.H.

When Sara was asked whether she believed that Mother had made positive changes, Sara answered,

At first, I thought she did until I seen that she was still hanging around the same people and acting the same way. Only when we would go to church and be around the church people she would act

29

different, like a changed person, but when we would go—when we were around Rowdy and stuff, she wasn't changed. No.

## 8. Adequate health and nutritional care

Mother testified that G.H. was on a breathing treatment when she was returned, but Mother did not know why G.H. was on the treatment or what she was allergic to. *See id.* § 263.307(b)(12)(A). Mother said that G.H.'s "allergies have stopped," so she no longer uses the breathing treatment. Mother testified that she takes G.H. to the doctor and has not missed any appointments. She also testified that she did not seek out any prenatal care while she was pregnant.

Trey testified that he was concerned about Mother feeding G.H. He said:

[O]ne time we went to go eat and all she gave the baby was a tomato, and the baby didn't eat anything. And I'm like, "Why is she not eating?" She's like, "Well, I guess she's not hungry." I'm like, "Well, have you fed her?" She's like, "No." And I said, "Okay. Did the daycare?" She's like, "I don't know." And she's just like, "I'm just mad right now," she's like, "because the daycare just cut all my rights off and everything, and they're not going to watch her anymore." So she was kind of taking it out on the baby. So that's the only time—

Q. When she said that she'd given it—that she said she gave the baby a tomato?

A. Yes, and that was all she ate. And she don't like tomatoes. Because she's like, "Well, when you were little, you loved tomatoes with salt. So, I mean, she likes tomatoes too." And, I'm like, that doesn't mean she likes tomatoes. It doesn't just run in the family.

Q. Where were y'all at?

A. We were at Olive Garden.

Q. Okay.

30

A. And we had soups and salads, and that's all she would give her is just a tomato. And then Sara, she gave her some of her soup and she started eating like she's never ate before. It was really sad.

Mother's sister, Aunt Rhonda, testified that Mother has called her five or six times in the four months before trial to ask Aunt Rhonda to buy food for Mother and G.H.

Trey also spoke about a time when he had taken care of G.H. after she had been returned to Mother.[9] He changed G.H.'s diaper and noticed a rash. He said,

> One time she had a rash on her butt and it was kind of concerning. I asked my mom, . . . and then she texted me and said, "Well, you need to give her a bath and stuff." She's like, "I got her from daycare and she hasn't had a bath or anything." I was like, "Well, what about her eating and stuff?" And she's like, "Well, she hasn't ate all day either." And I'm like, "Really? You haven't fed this baby?"

> So I finally fed her some food that my grandparents had for her because they had food for her whenever she comes over and stuff, and she ate the whole entire can.

Trey testified that G.H.'s diaper had not been changed and "was just soaking wet." He said he understood that sometimes children get rashes, but he was concerned that the rash was so large. He said, "I mean, it's big, like, there's reasons for that. That's not being taken care of."

---

[9]Trey testified that he kept G.H. overnight on three occasions after her return to Mother.

### 9. Care, nurturance, and appropriate discipline

Mother described G.H. as being very smart. *See id.* § 263.307(b)(12)(B). She testified that G.H. is not receiving any services through Early Childhood Intervention. Hamilton testified that Mother was "very concerned" about G.H.'s development. Mother testified that she does not spank G.H., and when G.H. acts up, Mother "just tell[s] her 'no.'"

Trey testified that he saw Mother lose her patience with G.H. "all the time." *See id.* § 263.307(b)(12). He said,

> She just goes crazy. I mean, she'll—like, if she's holding the baby—and she don't want to hold the baby much. She'll just kind of like, "Here. Grab the baby. Take the baby." Like, she'd be like, "This is your sister. You take her," or to Sara she'd be like, "You take her. You take her." Like, she didn't want to hold her.
>
> The baby would be hungry and she would just stick a bottle in her mouth. She'd be like, "You need to shut up," I mean—and I've seen that multiple times too. And that's what she did to [her son J.S.], also. I mean, she's done that to a lot of her kids. She just sticks a bottle in their mouth and shuts them up and throws them in bed. She shuts the door.

When asked if he was concerned that such things would continue in the future, Trey said, "Oh, for sure."

Sara testified that she has seen Mother yell at G.H., which she found concerning because of G.H.'s age. Sara said that one time in the car, Mother threatened to slap G.H. if she did not behave. Sara said she was concerned because she did not know "what [Mother] does with [G.H.] . . . whenever [Sara

32

was] not around." Mother's brother-in-law also testified to seeing Mother "holler" at G.H.

### 10. Guidance and safety

Brager testified that at the time of trial, she would only recommend that Father have supervised visitation with G.H. Hamilton testified that she believes that Mother properly supervises G.H. Brager testified that because Mother is drug-free, she has "eliminated the safety risk to G.H." Mother testified that there was a lot of security at the Salvation Army and that it was very safe. *See id.* § 263.307(b)(12)(D).

When asked if he had concerns about G.H.'s safety in Mother's care, Dustin said,

> I'm not sure if she can do it without being on drugs. I mean, she's been clean, but I'm not sure she can—I've never really seen her clean when I was a kid, so, I mean, I don't know with her being clean if she can do it or not.

Dustin testified that he believed Mother was doing better but that he still had concerns.

### 11. Social support system

Mother testified that after she completed the inpatient program, her family told her that if she went through another program and "did some more extensive work, that they would be there for [her]." *See id.* § 263.307(b)(13). Hamilton testified that she believed Mother's sister Aunt Rhonda would continue to support Mother and G.H.

33

When asked what his purpose was in testifying in his mother's trial, Justin said:

> I don't really want to see my mom ruin another kid's life, so that's why I'm here.
>
> Q. And how do you think she would ruin [G.H.]'s life?
>
> A. I mean, because once probation's over, she's just going to be—I mean, she still hangs out with the same people, so she's going to get in the same crowd and do the same things. This ain't her first rodeo, you know what I'm saying? She's been down it two or three times. Every time[,] same stuff. I'm going to quit doing this and this. Going down the same street.
>
> Q. Now, has she—you said that she's—sounds like she's tried to get clean two or three times?
>
> A. Every time she comes out of prison she says she's going to stop. Never does.
>
> Q. And those times when she comes out of prison, was she—did she talk to you about her faith in God?
>
> A. Yes.
>
> Q. And why are you convinced that this time . . . won't be any different than the times before?
>
> A. Because you can only tell somebody something so many times and they're just not going to believe you no more. And the only reason she's probably being good is because she's on probation. Once there's no paper trail, you know, probably back to the same shit.

When the same question was asked of Mother's son, Trey, he said, "Because I know for a fact that my mom is not a mother enough to take care of my little sister, because I know from my experience and seeing growing up."

34

### 12. Parental abilities and future plans

Father said that he loved G.H.  He testified:

> I want to be in her life.  I want to learn to be a good father.  I want her to know me.  And that goes with my other child too.  I haven't had a chance with him yet, but I'd like to someday.  I know it's going to be a hard ro[w] to hoe . . . .

Father's other child is J.S., who is living with the Intervenors and whom Father has not seen in five or six years.  When asked whose fault it was that Father had not seen J.S., he answered, "I guess you could say it's mine."

Father testified that he had not held a fulltime job since 2002, twelve years before trial.  He admitted that he had been selling drugs and renting rooms in his house to pay bills and that he had been getting electricity illegally.  He had not paid any child support for J.S. or G.H.  Father had been a truck driver, but his license had been suspended for back child support.  Father had also lost his house to back taxes.

Mother stated that she had "always tried" to be a good mother to her oldest three children, but that she had "fallen short."  *See Holley*, 544 S.W.2d at 371–72.  She testified that she had not been given the opportunity to be a mother to her two younger sons.

Aunt Rhonda testified that G.H. would thrive better in S.C. and K.C.'s care.  Her concerns for G.H. if left in Mother's care were "[e]motional disturbance, anger, things that I've seen in the other children that have been in her care. . . . Not being happy and having a normal childhood, not having education and the

35

means to support [them]selves." Aunt Rhonda testified that Mother's oldest children have anger issues and one of them, at the age of twelve, "came after [her] son with a knife and tried to slit his throat." Aunt Rhonda said that despite Mother's progress, she did not think G.H. should live with Mother "[b]ecause there are stressful situations in life, and her probation—when her probation ends, I'm not sure how she will react or what she will do." Aunt Rhonda's husband also testified, "I don't believe that [Mother] can raise—can actually raise a child." He went on,

> I'd say she's been doing drugs, as far as I know, for about 16 years, and I don't think after a year's worth of trying to be clean that she's clean and still able to raise a child. She's never—even when she wasn't on—when we didn't know she was on drugs, she wasn't able to raise her child. She was always hollering at them, screaming at them, hitting them. So I don't believe she's going to be capable of raising a child.

Mother has her own room at the Salvation Army. *See id.* (looking at available assistance programs and stability of proposed placements). Mother testified that the free daycare she receives for G.H. will only last for six months. The case manager at Salvation Army referred Mother to a program called Community Enrichment in which Mother would receive case management for another nine months.

Mother testified about her plans for G.H.,

> My future plans for my daughter is to raise her in a home that she deserves to be in, give her the love and care and the support that she needs and to try to teach her in the right ways to be—to grow up to be a woman, to bring her to church every time we can. We attend church every Sunday. I think that's a big part of

36

somebody's life. And I hope she don't find out the bad things about me because she'll never see them.

Mother testified that there are no excuses for the poor decisions she has made and that she takes personal responsibility for her choices. Mother admitted that her addiction tore her family apart and testified that when she was on drugs, her mind was not "right. It's distorted."

The Intervenors wished to adopt G.H. K.C. said, "After we discussed it, since we already had [J.S.], we wanted them to be together, and we wanted them to both have a stable home and felt like at that time that that would be the best thing to do for both of them." At the time of trial, J.S., Mother's son who lives with the Intervenors, was eight years old. K.C. also has a thirteen-year-old son. K.C. further testified:

> I'm concerned about [G.H.]. If I wanted to adopt a child, there's many agencies that we could have gone through. There's many avenues that we could have approached. It's not about taking a child from someone. It's about what is best for that child. That was the same reason I took [J.S.]. I felt like I could give him a good home. We do give him a good home. He is happy, he is stable. And I wanted to do the same for [G.H.], and I still want to do the same for [G.H.]. I feel like we live a very steady and stable lifestyle and that we can give that to her, also.

**C. Analysis**

Father had been clean for only ninety-one days at the time of the termination trial. Father was in a rehab facility and had not had much contact with G.H. See *In re J.L.R.*, No. 11-05-00094-CV, 2006 WL 728069, at *2 (Tex. App.—Eastland Mar. 23, 2006, no pet.) (holding evidence legally and factually

37

sufficient to support best interest finding when father had limited contact with child and was currently incarcerated). Both Mother and Father continued to use methamphetamines while G.H. was in intensive care after her birth. *See In re J.L.B.*, 349 S.W.3d 836, 849 (Tex. App.—Texarkana 2011, no pet.) (noting that the parents' "poor judgment [and] the constancy of their drug use" weighed in favor of terminating their parental rights). Mother had been clean for a year; however, she had an extensive history of drug use and had at least once been clean for a year before relapsing in the past. Further, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

Both parents had been incarcerated. *See In re J.B.W.*, 99 S.W.3d 218, 229 (Tex. App.—Fort Worth 2003, pet. denied) (holding that incarceration is one factor courts can consider when determining the best interest of a child in a termination case). Mother had never held a job prior to the year before trial, and Father had not had employment for over twelve years. Father had also not completed any of his service plan. *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with [a] family service plan support a finding that termination is in the best interest of the child.").

Mother's criminal history included a conviction for injury to a child for biting her teenaged son. *See R.R.*, 294 S.W.3d at 235 (considering evidence of a

38

father's past convictions supportive of the trial court's best interest finding); *In re S.M.L.*, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (stating that the father's incarceration and pattern of criminal and violent conduct made it likely that he would face incarceration again in the future). A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.); *see also Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) ("[I]n considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past.").

Both parents testified that they suffered from depression, yet neither was on medication. *See In re K.W.*, No. 02-08-00162-CV, 2009 WL 417913, at *6 (Tex. App.—Fort Worth Feb. 19, 2009, no pet.) (mem. op.) ("Despite Appellant's bipolar diagnosis, she did not take medication and had not sought treatment from a mental health expert. This evidence also tended to show a potential emotional and physical danger to the children."); *In re E.A.W.S.*, No. 02-06-00031-CV, 2006 WL 3525367, at *11–12 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.) (holding that mother's "instances of mental instability and agitation, including threatening behavior and suicidal ideation" supported termination); *In re K.A.S.*, 131 S.W.3d 215, 226 (Tex. App.—Fort Worth 2004, pet. denied)

39

(discussing the emotional and physical danger of the mother's noncompliance in taking medications for her bipolar disorder).

Mother had a history of abusive relationships, including her relationship with Father, and her sons testified to witnessing violence in the home. There was evidence that Mother continued to associate with former abusive partners after G.H.'s return. Mother also maintained contact with someone she knew had alcohol and drug problems because she wanted him to buy her a car. The jury could believe from that evidence that there was a serious concern that Mother would fall victim to another abusive relationship and that Father would perpetrate more violence on future partners. *See In re J.D.B.*, No. 02-06-00451-CV, 2007 WL 2216612, at *3 (Tex. App.—Fort Worth Aug. 2, 2007, no pet.) (mem. op.) (noting that a factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent); *In re C.S.C.*, No. 02-06-00254-CV, 2006 WL 3438185, at *7 (Tex. App.—Fort Worth Nov. 30, 2006, no pet.) (mem. op.) (same).

There was evidence that Mother continued to have anger management problems, and there was scant evidence that Mother had done anything to address her anger issues. When Mother was asked about her alcohol use, she chose not to answer the question and pleaded the Fifth. Although the Department had elected not to proceed to trial on termination grounds, it found the evidence of Mother's alcohol use so concerning that it changed its recommendation in the middle of trial.

40

All three of Mother's adult children testified that they believed that Mother was not capable of raising G.H. and protecting her from harm, and they gave specific, fact-based reasons for their opinions. Weighing the credibility of the witnesses is within the sole province of the jury. *Golden Eagle Archery, Inc., v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) ("[T]he jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony."). The jury was free to believe their testimony that Mother had not made the progress she had claimed to have made. *See Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 98 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Despite the parent's testimony that he had stopped abusing narcotics and alcohol, the jury was not required to ignore the parent's long history of dependency and destructive behavior.").

Viewing all of the evidence in the light most favorable to the best-interest finding and considering the statutory and *Holley* factors, we hold that the jury could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Father and G.H. was in G.H.'s best interest, and we therefore hold the evidence legally sufficient to support the jury's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (holding evidence legally sufficient to support finding that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination). Similarly, reviewing all the evidence with appropriate

41

deference to the factfinder, we hold that the jury could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Father and G.H. and between Mother and G.H. was in G.H.'s best interest, and we therefore hold that the evidence is factually sufficient to support the jury's best-interest findings. *See* Tex. Fam. Code Ann. § 161.001(2). We therefore overrule Father's sole issue and Mother's third issue.

## IV. Ineffective assistance of counsel

In Mother's fourth issue, she argues that her trial counsel's assistance was ineffective. In analyzing the effectiveness of counsel in the context of a termination-of-parental-rights case, we follow a two-pronged test that was set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2062 (1984), to determine whether an attorney's representation was so inadequate as to be in violation of the Sixth Amendment right to effective assistance of counsel. *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003). In order to show ineffectiveness of counsel in a termination-of-parental-rights case, the appellant must show that counsel's assistance fell below an objective standard of reasonableness and that counsel's deficient assistance, if any, prejudiced the defendant. *Id.* (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064).

We acknowledge that there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). To overcome the

42

presumption of reasonable professional assistance, "[a]ny allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record. *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (quoting *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003)). If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

Mother complains that her trial counsel cited the wrong statutory provision in her motion to strike the Intervenors' intervention, belatedly filed her motion for no-evidence summary judgment, did not conduct certain discovery, filed a motion in limine that cited the wrong rule and made overbroad requests, instructed her to plead the Fifth in response to questions about her drinking alcohol and violating her probation, made some untimely objections and failed to make other objections, and "allowed the Ad Litem to inject his personal experiences into closing arguments."

43

It was Mother's burden to demonstrate how these acts of her trial counsel prevented a fair trial. *See H.R.M.*, 209 S.W.3d at 111 (quoting *M.S.*, 115 S.W.3d at 545) (stating that *Strickland* "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"). Besides her conclusory statement that but for counsel's actions, "a different result could have been obtained," Mother does not demonstrate how she was prejudiced. Further, much of what Mother contends is deficient could have been part of her counsel's trial strategy, and the record is silent regarding any explanation for his actions. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (stating that appellant must overcome the presumption that his trial counsel's conduct might be considered to be sound trial strategy). Other complaints, such as regarding the motion to strike and the motion for summary judgment, are meritless as they are issues on which Mother would not have prevailed regardless of her counsel's actions. *See In re T.N.F.*, 191 S.W.3d 329, 333 (Tex. App.—Waco 2006, no pet.) (Gray, J., dissenting) (citing *Thacker v. State,* 999 S.W.2d 56, 67 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) ("Trial counsel is not ineffective for failure to make meritless objections.")). We are not persuaded that counsel's actions were so outrageous that our confidence in the outcome of the trial has been undermined. *See Strickland*, 466 U.S. at 694, 104 S. Ct. 2052. We overrule Mother's fourth issue.

## Conclusion

Having overruled Father's sole issue and Mother's four issues, we affirm the trial court's judgment.

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

EN BANC

WALKER, J., filed a dissenting and concurring opinion.

DELIVERED:  June 18, 2015

45